ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Yakub Hazzard (Bar No. 150242)
YHazzard@rkmc.com
Rex D. Glensy (Bar No. 198909)
RDGlensy@rkmc.com
2049 Century Park East, Suite 3400
Los Angeles, CA 90067-3208
Telephone: 310-552-0130
Facsimile: 310-229-5800

Attorneys for Plaintiff
THE RAY CHARLES FOUNDATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

THE RAY CHARLES
FOUNDATION, a California
Corporation,

        Plaintiff,

v.

RAENEE ROBINSON, an individual;
RAY CHARLES ROBINSON, JR., an
individual; SHEILA ROBINSON, an
individual; DAVID ROBINSON, an
individual; ROBERT F. ROBINSON,
an individual; REATHA BUTLER; an
individual; and ROBYN MOFFETT,
an individual,

        Defendants.

Case No. CV12- 02725 ABC (FFMx)

**COMPLAINT FOR:**

(1)  Declaratory and Injunctive Relief;
(2)  Breach of Contract;
(3)  Breach of the Implied Covenant of
     Good Faith and Fair Dealing.

       Plaintiff The Ray Charles Foundation ("Plaintiff" or "The Foundation"), a

California Non-Profit Corporation, hereby alleges and avers based on knowledge as

to its acts, and information and belief as to the acts of others, as follows:

## NATURE OF THE ACTION

       1.    This suit seeks to avoid the consequences of actions perpetrated by

seven adult children (collectively, the "Defendants") of the world-famous and

renowned singer-songwriter Ray Charles Robinson, p/k/a Ray Charles ("Ray

60575062.1

COMPLAINT

1    Charles") who passed away in June 2004.  Less than two years prior to his passing,

2    in December 2002, Ray Charles gathered most of his twelve children (five of the

3    seven defendants (two were then incarcerated) and five others who are not part of

4    this action) in Los Angeles, California, to advise them of what he intended to

5    provide to each of them.  Specifically, Ray Charles advised his children that,

6    expressly conditioned upon their agreement as indicated below, he intended to fund

7    separate irrevocable trusts for the benefit of each of them in the amount of $500,000

8    (and he would take care of all the associated taxes), and that the children would

9    have no further interests in his estate.  In express consideration for said trusts, each

10   of the children who were over the age of eighteen at the time (including all of the

11   seven defendants in this case) entered into a written agreement whereby each

12   acknowledged and agreed that the said $500,000 irrevocable trust would be the

13   entirety of their inheritance from their father, that each would receive no further

14   inheritance from their father, and that each relinquished and waived any further

15   claims to their father's estate.  In complete disregard of the confidence, trust, and

16   belief in his own children that their father reposed in them, by undertaking the

17   actions described below in this Complaint, Defendants have reneged on and are in

18   breach or other violation of this agreement.

19        2.      To better explain the import of Defendants' improper acts, some

20   background context is necessary.  The Copyright Act permits authors and specified

21   parties to terminate copyright transfers and recapture those interests back from the

22   original transferee or a current grantee under certain narrowly defined

23   circumstances.  The stated policy behind these particular provisions of the

24   Copyright Act is to give the original transferor of the copyright the opportunity to

25   renegotiate for himself a better deal once the copyrighted assets at issue have

26   acquired a significantly higher market value than they had when the original

27   transfer took place.  These termination of transfer provisions of the Copyright Act

28   do not apply to works that were created as works made for hire.  Purporting to act

1   under these provisions of the Copyright Act, in March 2010, Defendants, each of

2   whom by that time had received the entirety of his or her $500,000 described

3   above, served copyright termination of transfer notices on the publishers of

4   approximately fifty-one individual musical compositions authored in whole or in

5   part by Ray Charles.  The notices suffer from various defects discussed below,

6   separate and apart from constituting a breach of the Defendants' said agreements

7   with their father.  Should these improper notices be allowed to effectuate the

8   termination of the underlying copyright transfers, the copyrights in these musical

9   compositions, along with some of the income derived from the exploitation of these

10  compositions in the United States, would be recaptured by Ray Charles's adult

11  children on a staggered basis beginning on April 1, 2012, and continuing until

12  September 28, 2019, depending either on the date the song first received federal

13  copyright protection or on the date the grant was effectuated.  (A chart listing the

14  songs and the purported effective date of the termination of transfer for each is

15  attached as Exhibit A).  This result is contrary to copyright law, as well as being a

16  breach of Defendants' said agreements with their father.

17       3.       The musical compositions listed on Exhibit A were originally written

18  and composed in whole or in part by Ray Charles pursuant to an employment

19  relationship while he was under an exclusive employment recording contract with

20  his record label.  As part of this employment relationship, a music publishing

21  company affiliated with that record label owned the musical compositions that Ray

22  Charles wrote.  This publishing company registered the copyrights at issue in this

23  action listing itself as the owner of these musical compositions.

24       4.       In September 1980, Ray Charles renegotiated with the original music

25  publishing company's successors-in-interest his payment terms for the songs that

26  are at issue in this action.  Ray Charles received further consideration in return for

27  this renegotiation.  If the musical compositions at issue in this action are not

28  deemed to be works made for hire as alleged above, then according to copyright

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  law, the September 1980 agreement is the fulfillment and satisfaction of the

2  Copyright Act's promise and intent to give Ray Charles the ability to renegotiate his

3  original deal to be able to take advantage of the increase in value of the copyrighted

4  works. Therefore, the copyright transfer of those musical compositions that are

5  subject to the renegotiated agreement are not subject to termination as a matter of

6  law. Consequently, all of the termination of transfer notices served by Defendants

7  pertaining to those musical compositions for which the 1980 agreement serves as a

8  renegotiation are invalid.

9       5.     The Foundation, which is a non-profit corporation, was created by Ray

10  Charles during his lifetime (it was originally called The Robinson Foundation for

11  Hearing Disorders, Inc., and later legally changed its name to The Ray Charles

12  Foundation), and owns the rights, title, and interest in the intellectual property and

13  contract rights of the late Ray Charles. The Foundation's purpose has been to

14  administer funds for scientific, educational and charitable purposes; to encourage,

15  promote and educate, through grants to institutions and organizations, as to the

16  causes and cures for diseases and disabilities of the hearing impaired and to assist

17  organizations and institutions in their social, educational, and academic

18  advancement of programs for the youth, and carry on other charitable and

19  educational activities associated with these goals as allowed by law. The

20  Foundation has provided substantial financial donations to various institutions

21  involved with areas of hearing diseases and cures, as well as other educational

22  resources for the needy. The Foundation depends upon the income received from

23  the said intellectual property and contract rights to continue the wishes of Ray

24  Charles and The Foundation's purpose. The self-serving attempts on the part of the

25  Defendants to deprive The Foundation of its said intellectual property and contract

26  rights not only is contrary to the express wishes of their father and in breach of the

27  agreement they signed and promises that they made, but is contrary to the best

28  interests of those innocent parties who would be benefited by the grants made by

1   The Foundation.  Among the rights held by The Foundation is the right to receive

2   royalty payments from the exploitation of musical compositions written by Ray

3   Charles during his lifetime, including those that are the subject of this action.  As a

4   result, if given effect, the termination of copyright transfer notices served by

5   Defendants will adversely affect these royalty payments thus injuring The

6   Foundation, and giving The Foundation standing to bring this action.  This injury

7   will be impossible to overcome given that The Foundation is precluded from

8   soliciting and accepting any private donation.

9       6.      Given that the notices are invalid pursuant to applicable copyright law,

10   and that the service of all of the notices constitute a breach of the agreements they

11   entered into with their father, a judicial declaration as to the validity of the notices

12   of termination of transfers is necessary.  This is especially important given that, as

13   noted above, the effective date of the earliest of these copyright terminations is

14   soon approaching, as it is purported to be April 1, 2012.

15      7.      Thus, to protect The Foundation's rights under copyright law, and to

16   enforce Ray Charles's respective agreements with the Defendants, The Foundation

17   brings this action for declaratory and other relief as set forth in detail below.

18                     JURISDICTION AND VENUE

19      8.      The Court has subject matter jurisdiction over the claims set forth

20   herein pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  The Court has original

21   jurisdiction over The Foundation's claims arising under the copyright laws of the

22   United States, 17 U.S.C. §§ 101 et seq., and the Declaratory Judgment Act, 28

23   U.S.C. § 2201(a), and supplemental jurisdiction over its related state law claims.

24      9.      The Court has personal jurisdiction over all Defendants because a

25   substantial part of the events giving rise to the claims set forth herein occurred in

26   the State of California and the Defendants have extensive contacts with the State.

27      10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)

28   because all Defendants are subject to the personal jurisdiction of this Court, and a

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   substantial part of the events giving rise to the claims set forth herein occurred

2   within this District.

3                               THE PARTIES

4        11.    Plaintiff is and at all times mentioned herein was a California

5   Corporation with its principal place of business in the State of California, in the

6   County of Los Angeles.  Ray Charles established The Robinson Foundation for

7   Hearing Disorders, Inc., (the "Robinson Foundation") during his lifetime.  The

8   name of the Robinson Foundation was later changed to The Ray Charles

9   Foundation.  The Foundation owns all rights in and to the intellectual property and

10  contract rights of the late Ray Charles, including the right to receive royalties and

11  other income from the exploitation of the musical compositions, the terminations of

12  which are at issue in this action.

13       12.    Upon information and belief, Defendant RAENEE ROBINSON is and

14  at all times mentioned herein was an individual residing in the County of Los

15  Angeles in the State of California and a daughter of Ray Charles.

16       13.    Upon information and belief, Defendant RAY CHARLES

17  ROBINSON, JR. is and at all times mentioned herein was an individual residing in

18  the County of Los Angeles in the State of California and the oldest son of Ray

19  Charles.

20       14.    Upon information and belief, Defendant SHEILA ROBINSON is and

21  at all times mentioned herein was an individual residing in the City of Minneapolis,

22  County of Hennepin in the State of Minnesota and a daughter of Ray Charles.

23       15.    Upon information and belief, Defendant DAVID ROBINSON is and at

24  all times mentioned herein was an individual residing in the County of San Diego in

25  the State of California and a son of Ray Charles.

26       16.    Upon information and belief, Defendant ROBERT F. ROBINSON is

27  and at all times mentioned herein was an individual residing in the County of Los

28  Angeles in the State of California and a son of Ray Charles.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

17.     Upon information and belief, Defendant REATHA BUTLER is and at all times mentioned herein was an individual residing in the City of Denver, County of Denver in the State of Colorado and a daughter of Ray Charles.

18.     Upon information and belief, Defendant ROBYN MOFFETT is and at all times mentioned herein was an individual residing in the City of Detroit, County of Wayne in the State of Michigan and a daughter of Ray Charles.

## FACTUAL ALLEGATIONS

### Termination Provisions Under the 1976 Copyright Act

19.     In 1976, Congress passed a completely new Copyright Act (the "1976 Copyright Act.")  The 1976 Copyright Act reformed numerous aspects of the previous Copyright Act passed in 1909 (the "1909 Copyright Act.")  In particular, and most relevant to this action, the 1976 Copyright Act changed the way in which federal copyright protection would begin, the methodology for calculating the duration of copyright protection, and the length of such copyright protection.

20.     The 1909 Copyright Act had a complicated system for determining the commencement of federal copyright protection.  In short, some form of publication of the work with notice, or registration of the work with notice, was required before a copyright owner could benefit from federal protection of his work.  As such, the mere completion of a copyrightable work did not automatically trigger federal copyright protections.  The 1976 Copyright Act eliminated the prior formalities in order to acquire copyright protection, and shifted to a system where federal copyright protection attached automatically upon the fixation of a work in tangible form.

21.     The change in the way federal copyright protection attached to works from the publication/registration system to the fixation system also necessitated a change in the methodology for determining the length of copyright protection. Under the 1909 Copyright Act, copyright owners were granted a 28-year term of federal copyright protection that would begin at the date of publication and/or

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   registration with the Copyright Office.  At the end of that 28-year term, so long as

2   certain formalities were adhered to, the author of the copyrighted work could renew

3   the copyright term for a further 28-year term.  The stated reason to have two 28-

4   year terms was to give the original author of the copyrighted work (who would

5   have often had to sell his rights during the first term at a low price) a second chance

6   to capitalize on the worth of his work if the copyrighted assets at issue became

7   more valuable in the intervening years.  The 1976 Copyright Act changed the

8   methodology to determine the date of commencement of federal copyright

9   protection to a system where copyright protection begins from the date the work

10   was fixed in a tangible medium, and lasts the length of the lifetime of the author

11   plus 50 years (later amended to 70 years) following the author's death.  In other

12   words, the duration of copyright protection methodology changed from a renewable

13   fixed term of years to a variable unitary term.

14        22.    The change from the renewable fixed term of years to a variable

15   unitary term would have resulted in removing the author's ability to recapture a

16   transferred copyright roughly half way through the term and renegotiate its transfer

17   on better terms (should the pertinent asset have increased in value in the intervening

18   time).  To avoid this result, and preserve the author's ability to renegotiate the terms

19   of copyright transfer following an increase in value of the copyrighted asset,

20   Congress enacted a new system which it termed "termination of transfers."

21        23.    The termination of transfers provisions of the 1976 Copyright Act (17

22   U.S.C. §§ 203 and 304(c)) allow, under a narrow set of statutorily defined

23   circumstances, the original grantor (or a majority of those persons identified in the

24   statute in the event the author is deceased) to recapture the copyright from the

25   original grantee for works that entered into federal copyright protection under both

26   the 1909 Copyright Act and the 1976 Copyright Act.  These termination of transfer

27   provisions do not apply to works that were created as works made for hire.  As to

28   works that entered into federal copyright protection under the 1909 Copyright Act

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   and whose transfer occurred prior to January 1, 1978, should the narrowly defined

2   set of circumstance delineated in the statute apply, the termination of transfers

3   provisions allow, in relevant part, for the original grantor (or a majority of those

4   persons identified in the statute in the event the author is deceased) to serve valid

5   termination notices upon the current holders of the copyright during a specified

6   window so that termination can be effectuated between the date the original

7   copyright was going to expire at the end of the renewed 28-year term (i.e., 56 years

8   after the work acquired federal copyright protection) and five years following such

9   date (17 U.S.C. §304(c)).  As to works that entered into federal copyright protection

10  under the 1976 Copyright Act and whose transfer therefore occurred after January

11  1, 1978, should the narrowly defined set of circumstance delineated in the statute

12  apply, the rules governing the termination of copyright transfer depend on whether

13  a work was already published at the time of the transfer.  For those works that were

14  published as of the date of the transfer, the termination of transfers provisions

15  allow, in relevant part, for the original grantor (or a majority of those persons

16  identified in the statute in the event the author is deceased) to serve valid

17  termination notices upon the current holders of the copyright during a specified

18  window so that termination can be effectuated between thirty-five and forty years

19  from the date of the transfer.  As to works that were unpublished at the time of the

20  transfer, the scheme is exactly the same as for similarly-situated published works

21  except that the termination can only be effectuated by valid notice between forty

22  and forty-five years from the date of the transfer (unless the works are then

23  subsequently published within the first five years of the transfer in which case the

24  termination can be effectuated by valid notice between thirty-five and forty years

25  from the date of such publication) (17 U.S.C. § 203).

26                      **Original Ownership of the Songs**

27        24.    Ray Charles was a world-renowned singer and songwriter who,

28  according to many, changed the world of music.  As an artist who was versatile and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   at ease in a wide variety of musical genres including rhythm and blues, soul, jazz,

2   country, rock and roll, pop, and gospel, Ray Charles inspired and entertained a

3   legion of millions of fans.  During his career Ray Charles wrote or co-wrote

4   numerous musical compositions which he and others recorded.  This action

5   involves only those musical compositions that Ray Charles wrote, either alone, or

6   with a co-author or co-authors.

7       25.    During the 1950s, Ray Charles signed several successive Musicians

8   Services Agreements (the "Musicians Agreements") covering different periods in

9   time with Atlantic Records ("Atlantic"), a record label that specialized at the time in

10  rhythm and blues music.  As part of these Musicians Agreements, Atlantic

11  employed Ray Charles as a performer for the purpose of recording songs that would

12  then be released under the Atlantic label.  These Musicians Agreements, among

13  other things, stated that Ray Charles was hired as an employee and that he and

14  Atlantic would mutually decide on which songs to record, that the recordings would

15  be subject to Atlantic's approval, that Atlantic would have complete control over

16  Ray Charles's and other musicians' services, that the records made and the

17  performances embodied within them would be the property of Atlantic, and that

18  Ray Charles would render his services as a recording artist exclusively to Atlantic.

19  In return for his services, Ray Charles received an advance payment based on the

20  number of songs he would record, as well as a royalty based on the number of

21  records sold.

22      26.    At the same time that Ray Charles was under contract as a recording

23  artist with Atlantic, as an integral part of that employment relationship, he was also

24  engaged as a songwriter by Progressive Music Publishing Co., ("Progressive")

25  which, as illustrated by the Verified Complaint in a lawsuit filed by Ray Charles in

26  New York Supreme Court on February 23, 1962, and the subsequent settlement

27  thereof dated March 16, 1962, was a wholly-owned and controlled company of

28  Atlantic with interlocking ownership, directors, and officers.  Moreover, upon

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1 information and belief, The Foundation alleges that Atlantic and Progressive shared

2 the same address and office space.  As was customary in the music industry at the

3 time, when an artist/songwriter, like Ray Charles, composed a musical composition

4 that the artist/songwriter and the record company decided to record, a music

5 publishing company that was owned by or affiliated with the record label would

6 often own (and in this instance, did own) the copyright in the underlying musical

7 composition.  In accordance with this industry-wide custom and practice, when Ray

8 Charles and Atlantic decided to record a musical composition that Ray Charles had

9 written, Atlantic's affiliated music publishing company Progressive owned the

10 copyright in that musical composition.  As such, said musical compositions were

11 composed as an employee of Progressive and thus are not subject to termination.

12   27.  Sometimes, without affecting the arrangement outlined in the

13 preceding paragraph, Progressive would memorialize its ownership in a musical

14 composition written by Ray Charles, such as "I Got A Woman," in a so-called

15 single songwriter agreement entitled "Standard Uniform Songwriters Contract" (the

16 "Songwriters Contract.")  Under the terms of the Songwriters Contract for "I Got A

17 Woman," Progressive was deemed the owner of the copyright the song.  According

18 to the Songwriters Contract, Ray Charles received: (1) a very small advance (such

19 as one dollar) on his royalty payments; (2) a royalty for every sale of sheet music of

20 the song in the United States and Canada; (3) a royalty for every sale of an

21 arrangement of the song in the United States and Canada; and (4) a royalty for

22 every sale of the associated rights of the song in the United States and Canada,

23 (such as mechanical rights (the right to record the song) and motion picture

24 synchronization and television rights (the right to use the song in a movie or a

25 television production)).  (Items (2)-(4) above shall be referred to as the "Domestic

26 Royalties.")  In addition to these Domestic Royalties, still pursuant to the same

27 Songwriters Contract, Ray Charles also received a royalty for every sale of the song

28 outside of the United States and Canada (the "Foreign Royalties.")

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

28.     After Ray Charles composed a song under his employment agreement with Atlantic, Progressive would register the copyright in said song indicating itself as the owner in the registration filed with the Copyright Office.  This registration sometimes occurred several years after Ray Charles had delivered the song to Progressive and Atlantic as a result of his employment obligations.  All the songs at issue in this action, regardless of their dates of copyright registration, were written while Ray Charles was employed by Atlantic and Progressive, and all those that were recorded and released, were embodied on various albums on the Atlantic label.

### The 1980 Agreement

29.     In 1980, Rightsong Music, Inc., ("Rightsong") the apparent successor-in-interest of Progressive at the time, entered into an agreement with Ray Charles pertaining to two distinct categories of songs (the "1980 Agreement"): (a) musical compositions that Ray Charles had already assigned to Progressive/Rightsong (collectively referred to as the "Assigned Compositions," and identified as Exhibit B to this Complaint); and (b) published and unpublished musical compositions that Ray Charles had not previously assigned to any publisher (collectively referred to as the "Unassigned Compositions," and identified as Exhibit C to this Complaint).

30.     Pursuant to the terms of the 1980 Agreement, in addition to continuing to receive the royalties, Ray Charles received a significant cash payment in "further consideration for the grants [relating to the Unassigned Compositions], acknowledgements and confirmations [relating to the Assigned Compositions.]"

### The Agreement Between Ray Charles and His Adult Children

31.     In late 2002, Ray Charles sought to revise his comprehensive estate plan to include providing for each of his twelve children (the seven defendants in this action and five others).  Pursuant to this plan, provided expressly that his children agreed as indicated herein, Ray Charles intended to fund separate irrevocable trusts for the benefit of each of his children in the amount of $500,000

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   and to pay all the associated taxes that stemmed from such transaction.  It was

2   explained to his children that the $500,000 trusts were all that each of them would

3   receive from Ray Charles's estate.

4      32.   In express consideration for Ray Charles's funding of this irrevocable

5   trust, each of his children who had attained the age of majority at the time (which

6   includes all seven Defendants in this action) signed identical Statements (the

7   "Statements") where they acknowledged, declared, and agreed that the $500,000

8   trust was his or her "entire inheritance from him [Ray Charles] and I understand

9   that I will not inherit anything further under my father's estate plan and that I am

10  waiving any right to make a claim against his estate."  It was further explained to

11  the children present (and later, upon their release, to the two Defendants who were

12  incarcerated at the time) that should they refuse to sign the Statement, they would

13  receive nothing from Ray Charles, i.e., he would not fund the irrevocable trust in

14  their name nor otherwise provide for them.  All seven Defendants signed such

15  Statement and subsequently all received the full amount of the trust.

16     33.   Ray Charles died in June 2004, only eighteen months after most of the

17  Defendants had signed the Statements (one Defendant signed the Statement in

18  August 2003) agreeing that they would not inherit anything more from their father,

19  other than the irrevocable trust, and that they would waive all rights to make a

20  claim against their father's estate.  Pursuant to his estate plan, Ray Charles left all of

21  his rights in his works and rights under contracts, including the compositions that

22  are the subject of this action, to The Foundation.

23              **The Improper and Invalid Copyright Termination Notices**

24     34.   In defiance of the trust and confidence reposed in them by their father,

25  and in complete breach of the Statement that each of them signed, on March 30,

26  2010, purporting to act under the termination of transfers provisions of the 1976

27  Copyright Act, Defendants served thirty-nine copyright termination notices on a

28  whole host of entities, including, but not limited to, Progressive's successor-in-

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   interest, Warner/Chappell Music, of approximately fifty-one individual musical

2   compositions written or co-written by Ray Charles.  Copies of such notices were

3   also served on other parties including but not limited to Broadcast Music, Inc.

4        35.    All of the musical compositions to which the termination notices

5   pertain are encompassed by the 1980 Agreement as either Assigned or Unassigned

6   Compositions.  According to the 1976 Copyright Act, the effective date chosen for

7   such terminations cannot be less than two years or more than ten years from the

8   date the notices are served.  Thus, the earliest date for termination chosen by

9   Defendants is April 1, 2012, being two years from the serving of the notices.

10   Because the time for the effective dates of termination is dictated by the 1976

11   Copyright Act according to either the date of the grant or the date of publication of

12   the composition, the effective dates of termination of the fifty-one individual

13   composition titles that are at issue in this action are staggered, commencing, as

14   noted, on April 1, 2012, and ending on September 28, 2019.  (See Exhibit A to the

15   Complaint).

16        36.    It appears that, for the Assigned Compositions, Defendants scoured the

17   copyright registrations for the individual titles and based their effective dates of

18   termination on the date indicated therein that said title "originally secured" its

19   copyright.  Because some of these Assigned Compositions have more than one

20   copyright registration and Defendants elected to serve termination notices on all

21   registrations that they could find pertaining to these compositions, some of the

22   Assigned Compositions have more than one termination notice pertaining to them.

23        37.    In addition, and rather confusingly, Defendants are also attempting to

24   terminate the transfers of both the Assigned and Unassigned Compositions that

25   were the subject of the 1980 Agreement.  Thus, as it pertains to the Assigned

26   Compositions, Defendants have, for some compositions, served no less than three

27   different termination notices.  The situation of the Ray Charles song "Mary Ann," is

28   illustrative: Defendants have served a purported termination for a supposed January

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    23, 1955, transfer (supposedly to take effect on April 1, 2012), another purported

2    termination for a supposed May 2, 1963, transfer (supposedly to take effect on May

3    3, 2019), and, because "Mary Ann" is an Assigned Composition under the 1980

4    Agreement, a third termination for a supposed transfer contained in this September

5    23, 1980, agreement (supposedly to take effect on November 15, 2015). Even if

6    some of the terminations were deemed valid, it is still extremely difficult, if not

7    impossible to determine when the copyright of the Assigned Compositions will

8    change hands.

9       38.    As for the Unassigned Compositions, some of which had not yet been

10   published at the time of the execution of the 1980 Agreement, Defendants have

11   chosen an effective date of termination that is thirty-five years from the date of

12   transfer of the copyright. As to the unpublished musical compositions that form a

13   part of the Unassigned Compositions, this is contrary to the 1976 Copyright Act

14   that provides that such copyright cannot be terminated until the earlier of forty

15   years from the date of transfer or thirty-five years from the date of publication

16   following transfer, which for these Unassigned Compositions would mean no

17   earlier than the year 2020. Thus, the notices that pertain to the unpublished

18   Unassigned Compositions, which purport to terminate the copyright transfer in

19   2015, are defective and invalid.

20      39.    The situation left by Defendants' improper actions has created an

21   enormous cloud over the future copyright ownership of the approximately fifty-one

22   musical compositions that are at issue in this action. First, because the musical

23   compositions were created as an integral part of Ray Charles's employment with

24   Atlantic/Progressive, they are all to be construed as works made for hire and, as

25   such, are not subject to termination; therefore all rights associated thereto should

26   remain as is. Second, assuming that the musical compositions are not deemed to be

27   works made for hire, because the 1980 Agreement constituted a renegotiation of the

28   transfer of most of the songs contained therein, the purported terminations

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    pertaining thereto are null and void; consequently, the proper copyright ownership,
2    as to these compositions, should continue to rest with Warner/Chappell Music.
3    Third, because the 1980 Agreement was the original instrument of transfer of the
4    unpublished Unassigned Compositions and thus included the right of publication
5    which was not exercised within five years of such transfer, then the effective date of
6    termination noted in the notices pertaining to the unpublished Unassigned
7    Compositions is erroneous—consequently these notices should be declared invalid.
8    Fourth, assuming that the 1980 Agreement is not deemed to satisfy the 1976
9    Copyright Act's stated policy of allowing one further chance to renegotiate the
10   terms of an original copyright transfer, the transfer terms of the Assigned
11   Compositions, then, at a minimum, constitute a new and original transfer from
12   which the new termination dates should be calculated.  Fifth, regardless of the prior
13   four points, what The Foundation is being presented with are multiple notices of
14   termination pertaining to the same compositions, not all of which can possibly be
15   valid.  This scenario, which is entirely of Defendants' own making, beginning on
16   April 1, 2012, will make it very difficult, if not impossible, to exploit the valuable
17   copyrighted assets at issue because would-be third party licensees would have valid
18   doubts as to who is the proper copyright holder of these compositions.  Thus, there
19   is an extreme likelihood that the value of these copyrighted assets will be
20   permanently damaged.

21        40.    Moreover, because the royalty payments due to The Foundation as the
22   sole beneficiary of Ray Charles's estate, The Foundation will stand to be
23   substantially injured should these improper terminations be allowed to take effect.

24                           FIRST CAUSE OF ACTION

25              (Declaratory and Injunctive Relief Against All Defendants)

26        41.    The Foundation re-alleges and incorporates by reference each and
27   every allegation contained in paragraphs 1 through 40 of this Complaint as though
28   fully set forth herein.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   42.   An actual controversy has arisen, and now exists, between The

2   Foundation and Defendants concerning the validity and effectiveness of the

3   purported terminations of transfer under the 1976 Copyright Act.

4   43.   For the foregoing reasons, The Foundation seeks the following

5   declaration from the Court:

6   (a)   That the Statements are valid and enforceable contracts, and that

7   Defendants have breached these Statements;

8   (b)   That the copyright termination of transfers served by the

9   Defendants are not terminable because the musical compositions

10   were created as works made for hire;

11   (c)   That, in alternative to (b) above, the copyright terminations of

12   transfer served by the Defendants are invalid because they

13   attempt to nullify a renegotiation entered into in good faith by

14   Ray Charles and his publisher at the time as evidenced in the

15   1980 Agreement, in violation of the 1976 Copyright Act;

16   (d)   That, in alternative to (b) and (c) above, that the operative

17   transfers for the Assigned Compositions are those contained in

18   the 1980 Agreement and that therefore the effective date of

19   termination must be computed from the 1980 Agreement;

20   (e)   That the copyright terminations of transfer served by the

21   Defendants as to the unpublished Unassigned Compositions are

22   invalid because the effective date of termination chosen by

23   Defendants is incorrect given that the transfer contained in the

24   1980 Agreement of the unpublished Unassigned Compositions

25   included the publication right which was not exercised within

26   five years from such transfer; and

27   (f)   That the Court determine which of the multiple terminations

28   pertaining to each individual musical composition is the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1      operative one, if any.

2      44.    The Foundation is informed and believes, and based thereon alleges

3   that Defendants, and each of them, dispute each of The Foundation's contentions

4   hereinabove.

5      45.    The Foundation desires a judicial determination of the validity and

6   effectiveness of the termination notices and its rights and obligations under both the

7   Statement and the 1976 Copyright Act.  Such a declaration is necessary so that The

8   Foundation may ascertain its rights and obligations thereunder, to prevent further

9   breaches of the Statement, and to ensure that any clouds on the chain of title of the

10  copyrights at issue in this action be removed.

11     46.    The actions of Defendants alleged have caused, and continue to cause,

12  great and irreparable harm to The Foundation which cannot be adequately measured

13  by money damages alone.

14     47.    For the foregoing reasons, The Foundation also requests that an

15  injunction be entered whereby Defendants are enjoined from: (a) representing, or

16  allowing others either acting on their behalf or to whom they might have already

17  agreed to transfer the copyrights at issue in this action to represent to anyone that

18  Defendants, parties acting on behalf of Defendants, or parties to whom Defendants

19  might have already agreed to transfer the copyrights at issue in this action, are to

20  become, or have become, the rightful owners of the copyrights or interests in the

21  copyrights in the compositions at issue in this action following the various

22  purportedly effective dates of termination outlined in Exhibit A to this Complaint;

23  (b) entering into, or allowing others either acting on their behalf or to whom they

24  might have already agreed to transfer the copyrights at issue in this action to enter

25  into, any licensing agreements or any other arrangement that purports to transfer the

26  copyrights or interests in the copyrights in the compositions at issue in this action,

27  to any third parties (i.e., parties that, as of the date of this Complaint, do not already

28  own the copyright in these songs) following the various purportedly effective dates

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   of termination outlined in Exhibit A to this Complaint; and (c) using, or allowing

2   others either acting on their behalf or to whom they might have already agreed to

3   transfer the copyrights at issue in this action to use, the compositions at issue in this

4   action in any way (such as, but not limited to, reproduction, public performance,

5   and distribution), that is not consistent with the uses that would be permitted to any

6   non-copyright owner under the 1976 Copyright Act.

7                              SECOND CAUSE OF ACTION

8                    (Breach of Contract Against All Defendants)

9        48.   The Foundation re-alleges and incorporates by reference each and

10  every allegation contained in paragraphs 1 through 47 of this Complaint as though

11  fully set forth herein.

12       49.   The Foundation as the successor to Ray Charles and beneficiary of his

13  estate has materially performed the terms and conditions of the Statement in the

14  manner specified therein, except for those obligations, if any, that have been

15  waived, excused, or prevented by Defendants, and each of them.

16       50.   Defendants, and each of them, have failed and refused, and continue to

17  fail and refuse, to tender their performance as required by the Statement.

18  Defendants have been in material breach and continue in material breach of the

19  following obligations, among others:

20            (a)   By serving numerous termination of transfer notices which, if

21                  allowed to take effect, will result in a monetary loss to The

22                  Foundation as the beneficiary of Ray Charles's estate, thus

23                  resulting in a claim against this estate in violation of their

24                  agreement to waive any right to make a claim against Ray

25                  Charles's estate; and

26            (b)   By serving numerous termination of transfer notices which, if

27                  allowed to take effect, will produce an income stream to the

28                  Defendants at the expense of The Foundation in violation of

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

their agreement that they will not inherit anything other than the

irrevocable trust under Ray Charles's estate plan which

stipulates that such income streams are to go to The Foundation.

51.    As a direct and proximate result of the foregoing material breaches of the Statement, The Foundation has been, and will be, damaged in an amount of at least $500,000 per defendant (thus totaling at least $3,500,000).  The Foundation will seek leave of this Court to amend this Complaint to reflect any further amounts of damages once these have been ascertained.

### THIRD CAUSE OF ACTION

(Breach of the Implied Covenant of Good Faith and

Fair Dealing Against All Defendants)

52.    The Foundation re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 51 of this Complaint as though fully set forth herein.

53.    The Statement contains a covenant implied by law that Defendants, and each of them, will act toward The Foundation (as successor-in-interest of Ray Charles) in good faith and with fair dealing.

54.    The implied covenant of good faith and fair dealing imposes upon Defendants, and each of them, the duty not to take any action with the motive to frustrate The Foundation's exercise of its rights under the Statement.  The Foundation alleges that Defendants, and each of them, in doing the acts alleged herein, have breached the covenant of good faith and fair dealing implied in the Statement in that they, in bad faith and with a motive to intentionally frustrate The Foundation's exercise of its rights under the Statement, have perpetrated the above-described acts and omissions, and through their willful acts of serving the aforementioned copyright termination of transfer notices, have prevented The Foundation from gaining the benefit of its bargain.

55.   As a direct and proximate result of the above-described acts of Defendants, and each of them, The Foundation has been damaged in an amount to be established at trial.

WHEREFORE, The Foundation respectfully prays for judgment as follows:

1.   For a declaration of The Foundation's rights under the Statement and the 1976 Copyright Act as alleged hereinabove;

2.   For actual and compensatory damages in an amount to be determined at the trial of this action, but no less than $500,000 per defendant for a total of at least $3,500,000;

3.   For the imposition of a constructive trust for the benefit of The Foundation upon all funds, assets, revenues and profits that Defendants, or each or any of them, or parties acting on their behalf, or parties to whom Defendants might have already agreed to transfer the copyrights at issue in this action, have received or may receive from the future licensing or other exploitation of the musical compositions at issue and listed in Exhibit A to this Complaint;

4.   For an injunction against Defendants, and each of them, enjoining them or any parties acting on their behalf, or parties to whom they might have already agreed to transfer the copyrights at issue in this action from:

(a)   Representing to anyone that they are to become, or have become, the rightful owners of the copyrights in the songs at issue in this action following the various purportedly effective dates of termination outlined in Exhibit A to this Complaint;

(b)   Entering into any licensing agreements, or any other arrangement that purports to transfer the copyrights or any rights in the copyrights in the songs at issue in this action, to any third parties (i.e., parties that, as of the date of this Complaint, do not already own the copyright in these songs) following the various purportedly effective dates of termination outlined in Exhibit A to this

1   Complaint; and

2          (c)    Using the songs at issue in this action in any way (such as, but

3   not limited to, reproduction, public performance, and distribution), that is not

4   consistent with the uses that would be permitted to any non-copyright owner under

5   the 1976 Copyright Act.

6          5.    For costs of suit herein incurred;

7          6.    For reasonable attorneys' fees;

8          7.    For interest on any monetary award to The Foundation;

9          8.    For any other orders necessary to accomplish complete justice between

10   the parties; and

11          9.    For such other and further relief as this Court may deem just and

12   proper.

16   DATED: March 28, 2012          **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

18                                  By: _____
                                        Yakub  Hazzard
                                        Rex D. Glensy

20                                  2049 Century Park East
                                    Suite 3400
21                                  Los Angeles, CA  90067-3208
                                    310-552-0130

22                                  **ATTORNEYS FOR PLAINTIFF**
23                                  **THE RAY CHARLES FOUNDATION**

*ROBINS, KAPLAN, MILLER & CIRESI L.L.P.*
*ATTORNEYS AT LAW*
*LOS ANGELES*

COMPLAINT

# EXHIBIT A

| Date of Termination | Name of Song | Date of Putative Grant | Date of Calculation |
|---|---|---|---|
| 4/1/2012 | I Got a Woman | 3/8/63 | 12/20/54 +56 |
| 4/1/2012 | I Got a Sweetie | 3/8/63 | 2/28/55 +56 |
| 4/1/2012 | Come Back Baby | 12/31/62 | 12/20/54 +56 |
| 4/1/2012 | Mary Ann | 3/22/63 | 1/23/56 +56 |
| 4/1/2012 | Blackjack | 12/31/62 | 9/9/55 +56 |
| 4/1/2012 | This Little Girl of Mine | 6/5/63 | 6/1/55 +56 |
| 4/1/2012 | A Fool for You | 2/15/62 | 6/1/55 +56 |
| 5/4//2012 | Don't Deceive Me | 11/30/55 | 5/31/56 +56 |
| 5/4/2012 | Hallelujah, I Love Her So | 2/15/63 | 5/3/56 +56 |
| 9/11/2012 | Leave My Woman Alone | 10/3/63 | 9/10/56 +56 |
| 1/19/2013 | Ain't That Love | 12/3/62 | 1/18/57 +56 |
| 1/19/2013 | I Want to Know | 3/8/63 | 1/18/57 +56 |
| 5/21/2013 | It's All Right | 3/8/63 | 5/20/57 +56 |
| 1/9/2014 | What Kind of Man are You | 6/5/63 | 1/8/58 +56 |
| 2/20/2014 | This Little Girl of Mine | 6/5/63 | 2/19/58 +56 |
| 7/25/2014 | You Be My Baby | 6/5/63 | 7/24/58 +56 |
| 7/26/2014 | I Got a Sweetie | 3/8/63 | 7/25/58 +56 |
| 11/4/2014 | Blues Waltz | 2/9/68 | 11/13/58 +56 |
| 11/7/2014 | Rockhouse (Part 1) | 4/1/63 | 11/6/58 +56 |
| 11/7/2014 | Rockhouse (Part 2) | 4/1/63 | 11/6/58 +56 |
| 11/14/2014 | Hot Rod | 9/23/80 | 11/13/58 +56 |
| 6/18/2015 | Hallelujah, I Love Her So | 2/15/63 | 6/17/59 +56 |
| 7/2/2015 | Fathead | 9/23/80 | 7/1/59 +56 |
| 11/15/2015 | [Assigned and Unassigned Compositions] | 9/23/80 | 9/23/80 +35 |
| 2/23/2017 | Leave My Woman Alone | 10/3/63 | 2/22/61 +56 |
| 9/8/2017 | Hard Times | 2/15/62 | 8/18/61 +56 |
| 9/12/2018 | Blackjack | 12/31/62 | 9/11/62 +56 |
| 9/12/2018 | A Fool for You | 2/15/62 | 9/11/62 +56 |
| 9/12/2018 | Come Back Baby | 12/31/62 | 9/11/62 +56 |
| 1/29/2019 | Hard Times | 2/15/62 | 1/28/63 +56 |
| 3/12/2019 | Rockhouse | 4/1/63 | 3/11/63 +56 |
| 4/20/2019 | I Want to Know | 3/8/63 | 4/19/63 +56 |

60573737.1

EXHIBIT A PAGE 23

| Date of Termination | Name of Song | Date of Putative Grant | Date of Calculation |
|---|---|---|---|
| 4/23/2019 | It's All Right | 3/8/63 | 4/22/63 +56 |
| 5/3/2019 | Mary Ann | 3/22/63 | 5/2/63 +56 |
| 5/28/2019 | Leave My Woman Alone | 10/3/63 | 5/27/63 +56 |
| 6/7/2019 | Hot Rod | 9/23/80 | 6/6/63 +56 |
| 7/26/2019 | Fathead | 9/23/80 | 7/25/63 +56 |
| 9/28/2019 | Tell Me How Do You Feel | 10/3/63 | 9/27/62 +56 |
| 9/28/2019 | What Kind of Man are You | 6/5/63 | 9/27/62 +56 |

60573737.1

EXHIBIT A PAGE 24

# EXHIBIT B

SCHEDULE A TO AGREEMENT DATED        , 1980 BETWEEN
RAY CHARLES AND RIGHTSONG MUSIC, INC.

| Composition | Writer(s) | Percentage(s) |
|---|---|---|
| AIN'T THAT LOVE! | RAY CHARLES | 100% |
| BLACKJACK | RAY CHARLES | 100% |
| BLUES WALTZ | RAY CHARLES | 100% |
| COME BACK BABY | RAY CHARLES | 100% |
| DON'T DECEIVE ME | RAY CHARLES | 100% |
| FATHEAD | RAY CHARLES | 100% |
| FOOL FOR YOU, A | RAY CHARLES | 100% |
| HALLELUJAH, I LOVE HER SO | RAY CHARLES | 100% |
| HARD TIMES (NO ONE KNOWS BETTER THAN I) | RAY CHARLES | 100% |
| HOT ROD | RAY CHARLES | 100% |
| I GOT A WOMAN (a/k/a I GOT A SWEETIE) | RAY CHARLES | 100%) |
| I WANT TO KNOW | RAY CHARLES | 100% |
| IT'S ALL RIGHT | RAY CHARLES | 100% |
| LEAVE MY WOMAN ALONE | RAY CHARLES | 100% |
| MARY ANN | RAY CHARLES | 100% |
| ROCK, THE | RAY CHARLES | 100% |
| ROCKHOUSE, PT.I | RAY CHARLES | 100% |
| ROCKHOUSE, PT.II | RAY CHARLES | 100% |
| TELL ME HOW DO YOU FEEL | RAY CHARLES | 50% |
|  | PERCY MAYFIELD | 50% |
| THIS LITTLE GIRL OF MINE | RAY CHARLES | 100% |
| WHAT KIND OF MAN ARE YOU | RAY CHARLES | 100% |
| YOU BE MY BABY | DOC POMUS | 33-1/3% |
|  | MORT SHUMAN | 33-1/3% |
|  | RAY CHARLES | 33-1/3% |

EXHIBIT B  PAGE 25

# EXHIBIT C

SCHEDULE B TO AGREEMENT DATED          , 1980 BETWEEN
RAY CHARLES and RIGHTSONG MUSIC, INC.

| Composition | Writer(s) | Percentage(s) |
|---|---|---|
| BIT OF SOUL, A | RAY CHARLES | 100% |
| BLUE FUNK | RAY CHARLES | 100% |
| BLUE GENIUS | RAY CHARLES | 100% |
| CHARLESVILLE | RAY CHARLES | 100% |
| COSMIC RAY | RAY CHARLES | 100% |
| DAWN RAY | RAY CHARLES | 100% |
| DON'T YOU KNOW | RAY CHARLES | 100% |
| FUNNY BUT I STILL LOVE YOU | RAY CHARLES | 100% |
| GENIUS AFTER HOURS, THE | RAY CHARLES | 100% |
| HORNFUL SOUL | RAY CHARLES | 100% |
| I BELIEVE TO MY SOUL | RAY CHARLES | 100% |
| I HAD A DREAM | RAY CHARLES | 100% |
| I WONDER WHO | RAY CHARLES | 100% |
| JOY RIDE | RAY CHARLES | 100% |
| JUMPIN' IN THE MORNING | RAY CHARLES | 100% |
| LOVE ON MY MIND | RAY CHARLES | 100% |
| MR. CHARLES BLUES | RAY CHARLES | 100% |
| MY BONNIE | RAY CHARLES | 100% |
| NOBODY CARES | RAY CHARLES | 100% |
| RAY'S BLUES | RAY CHARLES | 100% |
| SOME DAY BABY | RAY CHARLES | 100% |
| SWANEE RIVER ROCK | RAY CHARLES | 100% |
| SWEET SIXTEEN BARS | RAY CHARLES | 100% |
| TELL ALL THE WORLD ABOUT YOU | RAY CHARLES | 100% |
| TAKIN' BOUT YOU | RAY CHARLES | 100% |
| THAT'S ENOUGH | RAY CHARLES | 100% |
| WHAT WOULD I DO WITHOUT YOU | RAY CHARLES | 100% |
| WHAT'D I SAY | RAY CHARLES | 100% |
| X-RAY BLUES | RAY CHARLES | 100% |

EXHIBIT C PAGE 26