UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| THE RAY CHARLES FOUNDATION, | CV 12-2725 ABC (FFMx) |
|         Plaintiff, | ORDER RE: DEFENDANTS' MOTION TO STRIKE AND MOTION TO DISMISS |
|    v. | |
| RAENEE ROBINSON, et al., | |
|         Defendants. | |

Pending before the Court are two motions filed on July 3, 2012, by Defendants Raenee Robinson, Ray Charles Robinson, Jr., Sheila Robinson, David Robinson, Robert F. Robinson, Reatha Butler, and Robyn Moffett: a Motion to Strike Plaintiff's State-Law Causes of Action Pursuant to California's Anti-SLAPP Law (Docket No. 15); and a Motion to Dismiss Plaintiff's Complaint (Docket No. 16). Plaintiff The Ray Charles Foundation (the "Foundation") opposed on July 23, 2012, and Defendants replied on August 13, 2012. The Court heard oral argument on September 24, 2012. The parties then filed supplemental briefs on

October 2 and October 9, 2012.[1]  For the reasons below, the motion to strike is GRANTED as to the Foundation's two state-law claims[2], and the Motion to Dismiss is GRANTED as to the remaining declaratory judgment claim.

### FACTUAL ALLEGATIONS

This case involves the rights to songs written or co-written by Ray Charles, esteemed musician and songwriter. (Compl. ¶ 24.)  During the 1950s, Charles signed several Musicians Services Agreements with Atlantic Records covering different periods of time. (Id. ¶ 25.) These Musician Services Agreements stated among other provisions that Charles was "hired as an employee" to record songs for Atlantic, that the recordings "would be subject to Atlantic's approval," that Atlantic "would have complete control over Ray Charles's and other musicians' services," that Atlantic owned the recordings produced, and that Charles would render services exclusively for Atlantic. (Id.) In return, Charlie would receive an advance payment and royalties on sales. (Id.)

In conjunction with Charles's "employment relationship" with Atlantic, Charles was also employed by Progressive Music Publishing Co. ("Progressive"), a company owned and controlled by Atlantic at the time, to write songs which were then owned by Progressive, not

---

[1]The Court DENIES the Foundation's request for further oral argument.  Fed. R. Civ. P. 78; Local Rule 7-15.

[2]The Foundation suggests that the Court defer ruling on this matter until the resolution of the appeal in DC Comics v. Pacific Pictures Corp., No. CV 10-3633 ODW (RZx) (C.D. Cal. filed on May 14, 2010).  The request is denied as moot, as that case was decided on January 10, 2013.  DC Comics v. Pacific Pictures Corp., No. 11-56934, 2012 WL 120807 (9th Cir. Jan. 10, 2013) (unpublished disposition). The Court has considered that decision herein.

Charles.  (Id. ¶ 26.)  As was customary in the music industry at the time, Charles composed songs and recorded them for Atlantic, but Progressive owned the copyrights to the underlying composition.  (Id.)  Sometimes Progressive would memorialize its ownership in a "Standard Uniform Songwriters Contract," which set forth Charles's entitlement to domestic and foreign royalties.  (Id. ¶ 27.)  Progressive would also register the songs with the Copyright Office and listed itself as the copyright owner.  (Id. ¶ 28.)  Importantly, all the songs at issue in this case "were written while Ray Charles was employed by Atlantic and Progressive, and all those that were recorded and released, were embodied on various albums on the Atlantic label."  (Id.)

In 1980, Charles allegedly renegotiated the terms of his agreement with Progressive's successor-in-interest over two categories of songs: (a) songs that Charles had already assigned to Progressive; and (b) published and unpublished compositions he had not previously assigned to any publisher (the "1980 agreement").  (Id. ¶ 29, Ex. A.)  Under that agreement, Charles continued to receive royalties, as well as a "significant cash payment."  (Id. ¶ 30.)  The Foundation does not allege that the 1980 agreement changed the ownership of the songs.  (Id. ¶¶ 29–30.)

In 2002, Charles entered an agreement with each of his twelve children, seven of whom are Defendants in this case.  (Id. ¶ 31.)  This agreement was short and simple:

> My father, Ray Charles Robinson, has told me that he will set up an irrevocable trust for my benefit, to be funded with $500,000.  This gift is my entire inheritance from him and I understand that I will not inherit anything further under my father's estate plan and that I am waiving any right to make a claim against his estate.

3

(Id. ¶¶ 31—32; Arredondo Decl., Ex. A.[3]).  Eighteen months later, Charles passed away and left all of his rights in his works to the Foundation.  (Id. ¶ 33.)

On March 30, 2010, Defendants served thirty-nine copyright termination notices pursuant to the 1976 Copyright Act, 17 U.S.C. § 304(c)(5), on various individuals with interests in Charles's works, including Warner/Chappell Music ("Warner/Chappell"), successor-in-interest to Progressive.  (Id. ¶ 34.)  Those notices seek to terminate transfers that occurred prior to 1978, the effective date of the 1976 Copyright Act.  (Id. ¶ 35, Ex. A.)  However, because all of the same songs subject to these termination notices were encompassed in the 1980 agreement, Defendants also served termination notices for those transfers pursuant to § 203 of the Copyright Act, which provides for termination of post-1978 transfers on similar terms as § 304(c).  (Id. ¶ 37.)  These sections of the Copyright Act generally allow a majority of an author's children, if the author is dead, to terminate most transfers or licenses of the author's works, upon timely notice to the transferee or licensee.  Under § 304(c), the earliest date to terminate any of the transfers was April 1, 2012, and the latest date is September 28, 2019.  (Id. ¶ 35, Ex. A.)  As for the terminations pursuant to § 203, the Foundation alleges that the earliest date for termination is 2020, and that Defendants' notices purporting to terminate the transfers in 2015 are premature.  (Id. ¶ 38.)

---

[3]Although the Foundation did not attach the agreements to the Complaint, it alleged the substance of them and bases its state-law claims on them, so the Court may consider them here.  See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (explaining that in deciding a motion to dismiss the Court may consider documents to which the complaint refers extensively or which form the basis of the plaintiff's claims in the complaint).

In response to the termination notices, the Foundation brought the pending federal declaratory judgment and state-law claims against the Defendants.  In the federal claim, the Foundation seeks a declaration that the termination notices were ineffective and untimely for various reasons, such as that (1) the compositions at issue are excluded from the termination provisions because they were works made for hire; (2) if the compositions were not works made for hire, then the 1980 agreement constituted a renegotiation of the transfer of most of the songs, satisfying the statutory right of termination; (3) the notices pertaining to unpublished works are invalid because the right of publication of those songs was not exercised within five years of the 1980 agreement; (4) the 1980 agreement constituted a new transfer and all termination deadlines should be calculated from that date; and (5) the Court should determine which of the multiple termination notices for each composition is operative, if any.  (Id. ¶ 43)  The Foundation also asserts a declaratory judgment claim and breach of contract and breach of the covenant of good faith and fair dealing claims on the ground that the "serving [of] numerous termination of transfer notices" were "claims against [Ray Charles's] estate" in violation of the agreements signed by Defendants.  (Id. ¶¶ 50, 54.)

Defendants have moved to strike the state claims pursuant to California's anti-SLAPP[4] statute, Cal. Code. Civ. P. § 425.16, and have moved to dismiss all of the claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6).

---

[4] SLAPP stands for "strategic lawsuit against public participation."  DC Comics v. Pac. Pictures Corp., __ F.3d __, __, 2013 WL 119716, at *2 (9th Cir. Jan. 10, 2013).

## MOTION TO STRIKE

### A.   Legal Standard

California's anti-SLAPP statute allows a defendant to bring a special motion to strike any state-law claim that "aris[es] from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue[.]"  Cal. Code Civ. P. § 425.16(b).  It was designed to discourage meritless cases brought for the sole purpose of "'chilling expression through costly, time-consuming litigation.'"  Batzel v. Smith, 333 F.3d 1018, 1024 (9th Cir. 2003).  The anti-SLAPP statute applies to any California state-law claim brought in federal court.  Id. at 1025—26.

In order for a court to strike a state-law claim, it must make a two-part inquiry.  Mindys Cosmetics, Inc. v. Dakar, 611 F.3d 590, 595 (9th Cir. 2010).  "First, the defendant must make a prima facie showing that the plaintiff's suit 'arises from an act in furtherance of the defendant's rights of petition or free speech.'"  Id.  If a defendant carries the burden to show that the challenged claims fall within the anti-SLAPP statute, then the plaintiff must demonstrate a probability of prevailing on the merits of the claims.  Id.

### B.   Discussion

#### 1.   Claims Based on Protected Activity

Acts protected by the anti-SLAPP statute include "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding

authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. Civ. Proc. Code § 425.16(e).

As relevant here, subsections (1) and (2) of section 425.16(e) apply to "any cause of action against a person arising from any statement or writing made in, or in connection with an issue under consideration or review by, an official proceeding or body." Briggs v. Eden Council for Hope & Opportunity, 19 Cal. 4th 1106, 1113 (1999).[5] Courts have interpreted this provision to bar claims based on communications made in the course of "official proceedings," but exclude claims based on "ministerial" business communications. Mindys Cosmetics, 611 F.3d at 596. For example, "official proceedings" can include "an attempt to establish a property right under a comprehensive federal statutory scheme," such as a trademark application filed pursuant to the Lanham Act. See id. at 597. In Mindys Cosmetics, an attorney filed a trademark application with the U.S. Patent and Trademark Office (the "PTO") that resulted in a lawsuit being filed against him for, among other claims, legal malpractice, fraudulent concealment, and breach of fiduciary duty. Id. at 594. The court held that the filing of a trademark application was "more than merely a ministerial act connected with a business transaction" because the statutory process of filing a trademark application included a determination by the PTO that the filer is the

[5]Defendants also argue that the Foundation's claims fall within subsection (4), but the Court need not address that issue because it finds that subsections (1) and (2) apply.

presumptive owner of a protectable mark. <u>Id.</u> at 597.  That process was similar to acts done in "official" proceedings that California courts have found to fall within the anti-SLAPP statute, <u>id.</u> at 596, such as the filing of a complaint with the SEC to solicit an investigation, which was "'designed to prompt action by that agency,'" <u>ComputerXpress, Inc. v. Jackson</u>, 93 Cal. App. 4th 993, 1009 (2001); the conducting of a hospital peer review procedure, which was required under the California Business and Professions Code governing those proceedings, <u>Kibler v. N. Inyo Cnty. Hosp. Dist.</u>, 39 Cal. 4th 192, 199—200 (2006); and the conducting of an investigative audit by a state auditor, which was "'government-sponsored and provided for by statute,'" <u>Braun v. Chronicle Publ'g Co.</u>, 52 Cal. App. 4th 1036, 1049 (1997).

In contrast to acts done in "official" proceedings, ministerial acts involving "primarily private transactions" do not trigger the anti-SLAPP statute. <u>Mindys Cosmetics</u>, 611 F.3d at 597.  In <u>Blackburn v. Brady</u>, 116 Cal. App. 4th 670, 676—77 (2004), for example, the court denied an anti-SLAPP motion directed at a claim based on statements made during a Sheriff's auction because the "ministerial event of a Sheriff's sale or auction simply does not concern an issue under review or determine some disputed matter as contemplated under the anti-SLAPP law"; it was merely a "business dealing or transaction." <u>Id.</u> at 677.  Similarly, in <u>A.F. Brown Elec. Contractor, Inc. v. Rhino Elec. Supply, Inc.</u>, 137 Cal. App. 4th 1118, 1129 (2006), the court refused to strike claims for libel, slander, and unfair business practices based on a supply company's filing of stop notices with a school district against a contractor because the plaintiff "did not request the district to commence any type of proceeding, or to make

any type of administrative or adjudicatory decision," even though the stop notices required the school district to withhold part of the funds due until a court could resolve the dispute.  Id.; see also Rouse v. Law Offices of Rory Clark, 465 F. Supp. 2d 1031, 1038 (S.D. Cal. 2006) (finding that the recording of a lien with the Recorder's Office was a "ministerial" communication that falls outside of the anti-SLAPP statute); Garretson v. Post, 156 Cal. App. 4th 1508, 1523 (2007) (finding notice of a nonjudicial foreclosure sale was not done in an official proceeding, but was "analogous to a business dealing or transaction").

The parties have not identified any cases determining whether termination notices under §§ 304(c)(5) and 203 filed with the Copyright Office and served on licensees constitute acts done in a "official proceeding" or simply ministerial acts.[6]  Defendants argue that, like the trademark application in Mindys Cosmetics, the termination notices are attempts to "establish a property right under a comprehensive federal statutory scheme," so they fall within the anti-SLAPP statute.  The Foundation contends that the termination notices are merely private ministerial acts like those in Blackburn and A.F. Brown that do not require any action by the Copyright Office, so they fall outside the anti-SLAPP statute.  Defendants are correct.

The termination provisions under the Copyright Act are "formalistic and complex, such that authors, or their heirs,

---

[6]The Court rejects the Foundation's argument that its state-law claims are not based on the filing of the termination notices, but only on the serving of the termination notices, which is a ministerial act.  (Compl. ¶¶ 50, 54.)  Although the Foundation's complaint only mentions the serving of the termination notices, the Copyright Act requires that the termination notices be recorded with the Copyright Office before they become effective, and Defendants followed that procedure in this case.  §§ 203(a)(4)(A), 304(c)(4)(A).

successfully terminating the grant to the copyright in their original work of authorship" only do so "'against all odds.'"  <u>Siegel v. Warner Bros. Entm't Inc.</u>, 542 F. Supp. 2d 1098, 1101–02 (C.D. Cal. 2008), <u>rev'd on other grounds sub nom.</u>, <u>Larson v. Warner Bros. Entm't Inc.</u>, No. 11-55863, et al., 2012 WL 6822241 (9th Cir. Jan. 10, 2013[7]) (unpublished disposition).  To be effective, the termination notice must be recorded with the Copyright Office before the effective date of the termination and must "comply, in form, content, and manner of service," with regulations promulgated by the Copyright Office.  § 203(a)(4)(A), (B).

Importantly, the regulations grant authority to the Copyright Office to review and reject the recordation of termination notices that "in the judgment of the Copyright Office" are untimely.  37 C.F.R. § 201.10(f)(4) ("Notwithstanding anything to the contrary of this section, the Copyright Office reserves the right to refuse recordation of a notice of termination as such if, in the judgment of the Copyright Office, such notice of termination is untimely.").  The regulations define when a notice is untimely:

> Conditions under which a notice of termination will be considered untimely include: the effective date of termination does not fall within the five-year period described in section 203(a)(3) or section 304(c)(3), as applicable, of title 17, United States Code; or the documents submitted indicate that the notice of termination was served less than two or more than ten years before the effective fate of termination.  If a notice of termination is untimely or if a document is submitted for recordation as a notice of termination on or after the effective date of termination, the Office will offer to record the document as a "document pertaining to copyright" pursuant to § 201.4(c)(3), but the Office will not index the document as a notice of termination.

---

[7] Westlaw appears to have erroneously reported the date of the disposition as November 5, 2012.

10

1   <u>Id.</u>

2      While this process may be less extensive and involved than the

3   review procedure under the Lanham Act, <u>see</u> <u>Mindys Cosmetics</u>, 611 F.3d

4   at 597, it is certainly more than simply ministerial and involves more

5   than just a private business transaction.  Timeliness, for example,

6   can be complicated — three separate termination provisions apply

7   depending on whether the transfer to be terminated occurred before

8   January 1, 1978, <u>see</u> § 304(c); after January 1, 1978, <u>see</u> § 203(a); or

9   before January 1, 1978, but the author's right to terminate was

10  unexercised and expired by the time the Sonny Bono Copyright Term

11  Extension Act of 1998 was passed, <u>see</u> § 304(d).  Indeed, in this case

12  the Foundation alleges that the termination notices directed at the

13  transfers in the 1980 agreement were premature because those transfers

14  cannot be terminated until 2020.  (Compl. ¶ 38.)  Similar to the

15  review undertaken by the PTO for trademark applications, the Copyright

16  Office's timeliness review is a more involved and public process than

17  the Sheriff's sale in <u>Blackburn</u>, which involved only a private

18  business dispute, or in <u>A.F. Brown</u>, which involved only the submission

19  of stop notices to a school district that did not commence any type of

20  proceeding or require an administrative or judicial decision.

21      The Foundation also cites two cases to argue that its state-law

22  claims are not based on the filing and serving of copyright

23  termination notices, but neither changes the Court's conclusion.  In

24  <u>Duncan v. Cohen</u>, No. C 08-2243 BZ, 2008 WL 2891065, at *1—3 (N.D. Cal.

25  July 22, 2008), the court denied an anti-SLAPP motion directed at

26  state-law claims because those claims were not based on the exercise

27  of free speech rights, but on alleged copyright infringement and a

28  contract over a movie, which does not create "'restrictions on freedom

of speech as copyright protects only form of expression and not the
ideas expressed.'"   Id. at *2.   Likewise, in DC Comics v. Pacific
Pictures Corp., No. 11-56934, 2013 WL 120807 (9th Cir. Jan. 10, 2013)
(unpublished disposition), the plaintiff brought claims for
interference with contract and prospective economic advantage against
the defendants, including Marc Toberoff — Defendants' counsel here.
Although the case involved termination notices filed by certain heirs
at Toberoff's urging, the Ninth Circuit concluded that the
interference claims were not based on protected activity, even if "(1)
protected conduct may have been the ultimate motivation for, or
eventual result of, the repudiation, or (2) an attorney may have
induced that repudiation."   Id. at *1.   The court also concluded that
the unfair competition claim was not "based on" protected activity
because the settlement negotiations that led to the agreements at
issue were "merely the backdrop to — and not the basis of — the unfair
competition claim."   Id. (citing In re Episcopal Church Cases, 45 Cal.
4th 467, 477—78 (2009)).   Importantly, the court noted that it did not
decide "whether the filing of copyright termination notices would
constitute protected conduct under California's anti-SLAPP statute."
Id. at *1 n.1; see also DC Comics v. Pac. Pictures Corp., __ F.3d __,
__, 2013 WL 119716, at *1 (9th Cir. Jan. 10, 2013) (noting in
contemporaneous decision finding interlocutory jurisdiction that the
plaintiff also brought "various other claims under state and federal
law regarding the [defendants'] attempts to exercise termination
rights pursuant to the 1976 Copyright Act (claims that are not the
subject of this appeal).").

     In contrast to these cases, the Foundation has not brought claims
based on copyright infringement or based upon any wrongful conduct

12

independent of the filing and serving of the termination notices; rather, the Foundation expressly alleges that Defendants breached their agreements with their father by taking advantage of the Copyright Act's termination provisions to recapture the copyrights at issue. This is not a case in which the termination notices form merely a "backdrop" to state-law claims based on other, non-protected activity. Thus, Defendants have carried their burden to demonstrate that the Foundation's state-law claims are based upon acts that fall within the anti-SLAPP statute.

2.    Reasonable Probability of Success on the Merits

Because Defendants have demonstrated that the Foundation's state-law claims for breach of contract and breach of the covenant of good faith and fair dealing fall within the anti-SLAPP statute, the Foundation must now demonstrate that it has a reasonable probability of succeeding on the merits of those claims. See Batzel, 333 F.3d at 1024. "Reasonable probability" means only a "'minimum level of legal sufficiency and triability,'" so the plaintiff need only "'state and substantiate a legally sufficient claim.'" Mindys Cosmetics, 611 F.3d at 598—99. In determining the probability of success, the Court considers "'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." Id. at 598 (quoting section 425.16(b)(2)).

The crux of the Foundation's state-law claims is that Defendants breached their agreements with Ray Charles not to "make a claim against his estate" by serving the termination notices on Warner/Chappell Music. Taking the Foundation's factual allegations as true, the Foundation has not demonstrated a probability of prevailing on these claims.

First, Defendants' termination notices could not be considered claims "against" Charles's estate because his estate went through probate and was closed in 2006, long before Defendants sent the termination notices in 2010. (Ervin Decl., Ex. I.) The agreements were plainly directed at Charles's children's inheritance, given that the two clauses that preceded the "claims against his estate" clause provided that the $500,000 was each child's "entire inheritance" and that the children would not "inherit anything further under my father's estate plan[.]" The agreement cannot plausibly be interpreted to impose an indefinite future obligation on Defendants not to take any action against assets that have gone through probate and have been distributed to the Foundation as a beneficiary, now that the estate is closed.

Second, if the Foundation is correct that Ray Charles created all the compositions at issue as works made for hire for Atlantic and Progressive, then Charles never owned any of the copyrights subject to the termination notices, so they could not have been part of his estate in the first place. As a result, any attempt by Defendants to recapture ownership of the copyright interests held by Warner/Chappell could not constitute claims against Charles's estate and therefore could not have breached the agreement between Charles and Defendants.

Third, assuming alternatively that Defendants' termination notices could be considered claims against Charles's estate because the compositions at issue were not works made for hire and Charles owned them when he died, the Copyright Act prevents the Court from interpreting the agreements signed by Defendants as limiting their statutory termination rights. The termination provisions in §§ 203(a)(5) and 304(c)(5) "allow[] an author, if he is living, or his

widow and children, if he is not, to recapture . . . the rights that had previously been transferred to third parties." <u>Classic Media, Inc. v. Mewborn</u>, 532 F.3d 978, 983 (9th Cir. 2008); <u>see also</u> <u>id.</u> at 984—85.  Importantly, this termination right is "inalienab[le]" because, under the statute, "[t]ermination of the grant may be effected <u>notwithstanding any agreement to the contrary</u>, including an agreement to make a will or to make any future grant." <u>Id.</u> (citing § 304(c)(5); emphasis in original); <u>id.</u> at 984 (citing § 203(a)(5), which uses identical language).  Here, if the agreements are interpreted to waive Defendants' rights to recapture the copyrights at issue, then they are plainly "agreement[s] to the contrary" of the Copyright Act's termination provisions and are unenforceable to that extent.

The Foundation claims that the agreements cannot be considered "agreement[s] to the contrary" of the termination provisions because those agreements do not expressly prevent Defendants from "effect[ing]" the termination of the grants at issue; instead, Defendants are free to terminate the grants — they will just be liable to the Foundation for at least $500,000 for breaching the agreements. (Compl. ¶ 51.)[8]  The Foundation most prominently relies on the Copyright Act's use of the word "effected" and distinguishes cases like <u>Classic Media</u>, which involved an assignment of rights that precluded the plaintiff from exercising her statutory termination rights, <u>see</u> 532 F.3d at 986, and <u>Marvel Characters, Inc. v. Simon</u>, 310

---

[8]Not only is the Foundation seeking $3,500,000 in damages based on the amount Ray Charles paid the seven Defendants, but it is also seeking a constructive trust over all "funds, assets, revenues, and profits" Defendants might receive from the compositions at issue. (Compl. at 21, ¶¶ 2—3.)

F.3d 280, 292 (2d Cir. 2002), which involved an agreement that retroactively deemed a work as a work made for hire that eliminated the statutory termination rights.  But forcing statutory heirs to choose between incurring a penalty for breaching an agreement or abandoning statutory termination rights is just a more creative way of preventing the exercise of termination rights in the first place.  3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 11.07[E][2][b][ii], [3] (2012) (explaining how penalties operate as "agreements to the contrary").  As a result, the Foundation has no probability of prevailing on its breach of contract claim.[9]

     The Foundation also has no probability of prevailing on its breach of the covenant of good faith and fair dealing claim.  The implied covenant is implied "as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract."  Los Angeles Equestrian Ctr., Inc. v. City of Los Angeles,

---

[9]Although extensively discussed by the Foundation, neither Milne ex rel. Coyne v. Stephen Slesinger, Inc., 430 F.3d 1036 (9th Cir. 2005) nor Penguin Group (USA) Inc. v. Steinbeck, 537 F.3d 193 (2d Cir. 2008) is relevant here.  Both cases found that agreements renegotiating licenses were not "agreements later to the contrary" under the Copyright Act, so they could preclude later exercise of termination rights.  See Milne, 430 F.3d at 1044—45; see also Steinbeck, 537 F.3d at 203.  The Foundation does not argue that the agreements at issue here somehow fit within that narrow factual scenario.  See Mewborn, 532 F.3d at 987 (noting that Milne involved "quite a distinct factual scenario with very different statutory implications").  Similarly, the Foundation's invocation of Ray Charles's testamentary intent is unpersuasive because the intent of the author is irrelevant under the termination provisions of the Copyright Act.  See Larry Spier, Inc. v. Bourne Co., 953 F.2d 774, 778 (2d Cir. 1992) (finding that the intent of an author in executing a will is irrelevant under § 304(c) because, "[i]f the author's intent were the paramount concern of the statute, then no termination of any kind would be allowed because most authors presumably 'intend' to make the assignment that is the very object of Section 304(c)'s termination provisions.").

17 Cal. App. 4th 432, 447 (1993) (internal quotation marks omitted;
emphasis in original).  Therefore, "[i]f there exists a contractual
relationship between the parties . . . the implied covenant is limited
to assuring compliance with the express terms of the contract, and
[it] cannot be extended to create obligations not contemplated in the
contract."  <u>Id.</u> (internal quotation marks omitted).  "If the
allegations do not go beyond the statement of a mere contract breach
and, relying on the same alleged acts, simply seek the same damages or
other relief already claimed in a companion contract cause of action,
they may be disregarded as superfluous as no additional claim is
actually stated."  <u>Careau & Co. v. Sec. Pac. Bus. Credit, Inc.</u>, 222
Cal. App. 3d 1371, 1395 (1990).  Here, the Foundation's breach of the
covenant claim is coextensive with its breach of contract claim and
seeks the same damages.  (<u>See</u> Compl. ¶¶ 54—55.)  Therefore, as with
its breach of contract claim, the Foundation has no probability of
prevailing on this claim.

   3. <u>Conclusion and Attorney's Fees</u>

  Defendants have demonstrated that the Foundation's state-law
claims are based on protected activity, thereby falling within the
anti-SLAPP statute, and the Foundation has failed to demonstrate any
probability of prevailing on those claims.  Because Defendants have
prevailed on their anti-SLAPP motion, attorney's fees are mandatory
and the Court awards them.  Cal. Code Civ. P. § 425.16(c); <u>Ketchum v.
Moses</u>, 24 Cal. 4th 1122, 1131 (2001).

**MOTION TO DISMISS**

  Because the Foundation's state-law claims must be dismissed
pursuant to the anti-SLAPP statute, the Foundation's only remaining
claim is for declaratory judgment invalidating the termination

17

notices.[10]  Some review of the parties' contentions on this claim is
warranted.  In their motion, Defendants originally challenged this
claim on the grounds that the Foundation is merely asserting the
rights of third-party Warner/Chappell and does not meet the prudential
standing requirements to do so.  The Foundation responded by arguing
that it was asserting its own interests because its receipt of
royalties from the transfers to Warner/Chappell rendered it a
"beneficial owner" with standing under the Copyright Act.[11]  In reply,
Defendants argued that the Foundation could not be a "beneficial
owner" even if it receives royalties because it has alleged that the
compositions at issue were works made for hire.  See Warren v. Fox
Family Worldwide, Inc., 328 F.3d 1136, 1144—45 (9th Cir. 2003)
(holding that author of work made for hire was not "beneficial owner"
with standing to assert infringement claim, even if receiving
royalties).

     At oral argument, the Court tentatively agreed with Defendants
that the Foundation did not have standing under Warren because it
alleged that the compositions were works made for hire.  However, the
Foundation argued that it alternatively alleged that the compositions
were not works made for hire, and therefore as a beneficial owner it
had standing to challenge the termination notices.  The Court then
ordered the parties to brief two issues: (1) assuming the compositions
were not works made for hire, "does the Foundation have standing under
the Copyright Act to challenge the termination notices under §§ 304(c)

---

[10]To the extent the Foundation's declaratory judgment claim also
seeks a declaration that Defendants breached their agreements, it must
be dismissed for the reasons already explained.
[11]A "beneficial owner" is "an author who had parted with legal
title to the copyright in exchange for percentage royalties based on
sales or license fees."  Warren v. Fox Family Worldwide, Inc., 328
F.3d 1136, 1144 (9th Cir. 2003) (internal quotation marks omitted).

and 203 as a 'grantee' of an 'exclusive or nonexclusive grant of a transfer or license' of any right under the copyrights?"; and (2) "can the Foundation allege facts to support a claim that the works were not works made for hire consistent with [Federal Rule of Civil Procedure] 11?" (Docket No. 31.)

In its supplemental brief, the Foundation argued that (1) § 501(b) of the Copyright Act creates a "zone of interests" for "beneficial owners" of copyright interests to sue for infringement, which extends to beneficial owners challenging termination notices under §§ 304(c) and 203; (2) even if § 501(b)'s zone of interests does not extend to §§ 304(c) and 203, the Foundation's interests fall within the "zone of interests" the termination provisions sought to protect; and (3) if it were required to, it could allege facts to support its alternative theory without violating Rule 11.  In response, Defendants argued that (1) standing under § 501(b) for "beneficial owners" does not extend to §§ 304(c) and 203; (2) the Foundation does not otherwise have standing under §§ 304(c) or 203 to challenge termination notices because its interests fall outside the "zone of interest" of §§ 304(c) and 203; and (3) in any case, the Foundation cannot amend its claims to assert its alternative theory without violating Rule 11.

As explained below, the Court finds that the Foundation's interests do not fall within the "zone of interests" the termination provisions were meant to protect, and it lacks third-party standing to assert the interests of Warner/Chappell.  The Court therefore need not address the parties' disagreement over whether the Foundation can amend its complaint to allege that the compositions at issue were not works made for hire.

### A.   Legal Standard

Dismissal is appropriate under Rule 12(b)(1) when the court lacks subject matter jurisdiction over the claim.  Fed. R. Civ. P. 12(b)(1).  A Rule 12(b)(1) motion may attack the plaintiff's standing under the Copyright Act.  See Warren, 328 F.3d at 1140.  Although lack of subject matter jurisdiction is an affirmative defense, the burden of proof in a 12(b)(1) motion is on the party asserting jurisdiction, and the court will presume a lack of jurisdiction until the pleader proves otherwise.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); Stock West, Inc. v. Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir. 1989).  However, "at this stage of the pleading, [the plaintiff] need only show that the facts alleged, if proved, would confer standing upon him."  Warren, 328 F.3d at 1140.

### B.   Discussion

Standing implicates both the constitutional "case or controversy" requirement, as well as a number of "prudential" limitations.  See Warth v. Seldin, 422 U.S. 490, 499—500 (1975).  Constitutional standing consists of "an injury in fact that is fairly traceable to the challenged conduct and has some likelihood of redressability."  McCollum v. Cal. Dep't of Corr. & Rehab., 647 F.3d 870, 878 (9th Cir. 2011).  One prudential standing requirement is that "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit."  Bennett v. Spear, 520 U.S. 154, 162 (1997).  Another prudential limitation is the limit on third-party standing: "[i]n the ordinary case, a litigant must assert his or her own legal rights and interests, and cannot rest a claim for relief on the legal rights or interests of third parties."  Powers v. Ohio, 499 U.S. 400,

410 (1991).  Finally, a plaintiff asserting a claim under the
Copyright Act must be statutorily authorized to bring the claim.  <u>See</u>
<u>Warren</u>, 328 F.3d at 1140.

  1.   <u>Constitutional Standing</u>

  Defendants have not challenged the Foundation's constitutional
standing and the Foundation has at least plausibly alleged that it
exists here.  The Foundation alleges that it is entitled to royalties
from the copyrights at issue (Compl. ¶¶ 5, 11, 33) and Defendants'
termination notices threaten to "adversely affect these royalty
payments thus injuring The Foundation" (<u>id.</u> ¶ 5).  If the Foundation
prevails, the termination notices would be rendered ineffective, and
the risk that the Foundation would lose those royalties would be
eliminated.  That is sufficient to allege injury, causation, and
redressability as required for constitutional standing.

  2.   <u>Statutory Standing and the "Zone of Interests" Test</u>

  The Foundation devotes a significant portion of its supplemental
brief to arguing that its claims fall within the "zone of interests"
protected by the Copyright Act and therefore it has prudential
standing to challenge the validity of the termination notices.  This
test is "'not meant to be especially demanding'" and is satisfied
unless the plaintiff's "'"interests are so marginally related to or
inconsistent with the purposes implicit in the statute that it cannot
reasonably be assumed that Congress intended to permit the suit."'"
<u>Thinket Ink Info. Resources, Inc. v. Sun Microsys., Inc.</u>, 368 F.3d
1053, 1059 (9th Cir. 2004).

  Because prudential standing requirements like the "zone of
interests" test "can be modified or abrogated by Congress," the "zone
of interests" depends on the scope of the statute at issue.  <u>Bennett</u>,

520 U.S. at 162–63; see also Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 394 n.7 (1987) ("'Congress can, of course, resolve the question [of standing] one way or another, save as the requirements of Article III dictate otherwise." (alteration in original)).  Therefore, in determining whether a plaintiff's grievance "arguably falls within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit," Bennett, 520 U.S. at 162, the Court must presume that "Congress legislates against the background of [the] prudential standing doctrine, which applies unless it is expressly negated," id. at 163, and must analyze the statute's provisions at issue to determine whether they "negate[] the zone-of-interests test," id. at 164.

The statutory provisions at issue here are §§ 304(c) and 203, the Copyright Act's termination provisions.[12]  Those sections do not define who may challenge termination notices, although, by their terms, they only contemplate that certain parties will be involved in the termination process.  For example, if the author executed the transfer sought to be terminated — as in this case — then upon his death his "termination interest is owned, and may be exercised" by his widow, his surviving children and grandchildren, or under some circumstances, by his executor or trustee, if the widow and children are dead.  § 304(c)(2); see also § 203(a)(2).  On the other side of

---

[12]"Zone of interests" cases frequently arise in challenges to agency action under the Administrative Procedures Act ("APA"), and the Supreme Court has cautioned that "the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes." Bennett, 520 U.S. at 163 (internal quotation marks omitted).  In this case the "zone of interests" inquiry turns on the interests served by §§ 304(c) and 203.

this "termination interest" is the recipient of the termination notices, i.e., the "grantee" or its successors of the transfer to be terminated, and "[t]he termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title." § 304(c)(4); see also 37 C.F.R. § 201.10(d) (requiring service on each grantee or successor whose rights are being terminated).  The plain language of these sections therefore indicate that only authors, statutory heirs owning a termination interest, and grantees of transfers and their successors fall within the "zone of interests" Congress contemplated in enacting these provisions.

The Foundation contends that, as a "beneficial owner" of the compositions at issue that can sue for infringement under § 501(b) of the Copyright Act, it must fall within the "zone of interests" Congress contemplated under the Copyright Act and should be permitted to challenge the termination notices under §§ 304(c) and 203.  That interpretation suffers from several flaws.  First, if the Foundation were to demonstrate that the compositions at issue were works made for hire not subject to termination under §§ 304(c) and 203 — as it alleges at length in its Complaint — then the Foundation would not be a beneficial owner able to sue under § 501(b).  See Warren, 328 F.3d at 1144.  If it has no standing under § 501(b), then it would make no difference if the "zone of interests" created by § 501(b) to protect beneficial owners extended to §§ 304(c) and 203.

Second, assuming the compositions were not works made for hire, the Foundation's argument under § 501(b) improperly rewrites that section into a catch-all standing provision that applies to the entire Copyright Act.  Section 501(b) expressly confers on beneficial owners standing to sue for infringement, whereas §§ 304(c) and 203 do not

mention beneficial owners at all; instead, they apply to authors, statutory heirs, and grantees of transfers and their successors.  By including beneficial owners in § 501(b) but omitting them from §§ 304(c) and 203, Congress must have intended to exclude them from the termination sections.  See Silvers v. Sony Pictures Entm't, Inc., 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (explaining that the doctrine of expressio unius est exclusio alterius carries with it "'a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.'").  Indeed, the Ninth Circuit in Silvers explained that § 501(b) was "carefully circumscribed," and because "[c]opyright is a creature of statute, [the court] will not lightly insert common law principles that Congress has left out."  Id.  Because Congress took care to include beneficial owners in § 501(b), it must have also purposefully excluded beneficial owners from §§ 304(c) and 203.[13]

Even if the Foundation might sue for infringement but not to invalidate the termination notices in the scenario in which they are not works made for hire, that outcome is not so unusual as to compel a different conclusion.  As Defendants note, in an infringement suit, the interests of a beneficial owner and a legal owner of a copyright are usually aligned — both parties would want to prevent illegal copying of the work.  But after receiving termination notices, the grantee might be more interested in maintaining an amicable

---

[13]The Court rejects the Foundation's argument that a passing reference to "any party" in the regulations implementing §§ 304(c) and 203 alters the plain text of those sections to allow a beneficial owner of a copyright to challenge a termination notice.  See 37 C.F.R. § 201.10(f)(6) ("Recordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction.").

relationship with the statutory heirs to facilitate renegotiations of the grants at issue, rather than to challenge the terminations. Congress even acknowledged this interest by allowing the grantee to enter a new grant before the effective date of the termination when all others must wait until after that date. § 304(c)(6)(D). Thus, there is no indication that the Foundation falls within the "zone of interests" under §§ 304(c) and 203 because it is a beneficial owner with standing to sue for infringement under § 501(b).

The Foundation also argues that, even if the standing provision in § 501(b) does not extend to §§ 304(c) and 203, the Foundation's interests in continued royalties fall within the "zone of interests" protected by the termination provisions. But the loss of royalties is the potential harm to the Foundation, and the "zone of interests" doctrine "turns on the <u>interest</u> sought to be protected, not the <u>harm</u> suffered by the plaintiff." <u>City of Los Angeles v. Cnty. of Kern</u>, 581 F.3d 841, 848 (9th Cir. 2009) (emphasis in original). As outlined above, the interests protected by §§ 304(c) and 203 are the rights of authors and statutory heirs to recover ownership of previously transferred copyright interests, and, to a lesser extent, the rights of a grantee or its successor in preserving or renegotiating the transfer. <u>See</u> <u>Larry Spier, Inc. v. Bourne Co.</u>, 953 F.2d 774, 778 (2d Cir. 1992) (finding it "evident from the plain language of Section 304(c) that the purpose of the statute is to protect the property rights of widows and children in copyrights," even if the author intended to provide for someone else by will); <u>see also</u> <u>Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.</u>, 155 F.3d 17, 25 (2d Cir. 1998) (explaining that the termination provisions were "designed to protect the interests of authors and their heirs and to maximize their

ability to exploit the value of [the copyrighted works] during the extended renewal term"). The Foundation is not asserting any of those interests here. Indeed, because the Foundation is not a grantee of the rights to be terminated or its successor, Congress did not even require the statutory heirs to provide it with statutory notice of the termination, let alone give it a seat at the table during the termination process. The Foundation's claims therefore fall outside the "zone of interests" to be protected under §§ 304(b) and 203.[14]

### 3. Third-Party Standing

Lacking standing to assert its own interests, the Foundation is really only asserting Warner/Chappell's interests in the termination notices. (Compl. ¶ 39 (alleging that the termination notices are void so "the proper copyright ownership . . . should continue to rest with Warner/Chappell Music.").) Third-party standing exists only when three criteria are satisfied: (1) an "injury in fact" that creates a "sufficiently concrete interest" in the outcome of the dispute; (2) a close relationship to the third party; and (3) the third party's inability to protect its own interests. Powers, 499 U.S. at 410—11.

The Foundation has not shown that it has a close relationship with Warner/Chappell or that Warner/Chappell cannot protect its own interests under the Copyright Act. Tellingly, Warner/Chappell has not challenged the validity of the termination notices, which it received almost three years ago (Compl. ¶ 34), suggesting that this is not a case in which the Foundation's "interests are aligned with those of

---

[14]The Foundation claims that it would have standing to assure that the terminations do not affect foreign rights or rights in derivative works, which are exempted from termination, see §§ 203(b)(1) & (5), 304(c)(6)(A) & (E), or rights not subject to the grant to be terminated. That argument begs the fundamental question here — whether the Foundation's claims fall within the "zone of interests" protected by the termination provisions.

the party whose rights are at issue" or that it "has a sufficiently close connection to [Warner/Chappell] to assert claims on that party's behalf." Pony v. Cnty. of Los Angeles, 433 F.3d 1138, 1147 (9th Cir. 2006). The Foundation also has not shown that Warner/Chappell is unable to assert its own interests here, if it so chooses. Thus, the Foundation does not have standing to assert Warner/Chappell's interests in seeking to invalidate the termination notices.

CONCLUSION

The Court GRANTS Defendants' Motion to Strike and STRIKES the Foundation's state-law claims. The Court also GRANTS Defendants' motion to dismiss the Foundation's federal claim for lack of standing. Because all of the flaws identified are legal, any amendment would be futile and leave to amend is DENIED. See Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990). **Defendants are ORDERED to lodge a proposed judgment dismissing this case with prejudice within 10 days of the date of this Order.** Moreover, because attorney's fees are mandatory under the anti-SLAPP statute, Defendants' request for attorney's fees is GRANTED. Defendants are ORDERED to file an application for fees no later than **February 11, 2013**. The Foundation may respond **no later than February 18, 2013,** and Defendants may reply **no later than February 25, 2013.** Once briefing is completed, the Court will take the matter under submission.

**IT IS SO ORDERED.**

**DATED: January 25, 2013**

_____

**AUDREY B. COLLINS**
**UNITED STATES DISTRICT JUDGE**